Good afternoon, and may it please the Court. My name is Sonia Winner. I'm here on behalf of the appellant, Wells Fargo Bank. With the Court's permission, I'd like to reserve five minutes for rebuttal. Very well. Now, in the previous appeal in this case, this Court held that although the National Bank Act barred the plaintiff's challenges to Wells Fargo's choice of posting order and to the adequacy of its disclosures, preemption did not apply to certain affirmative statements that were found to be misrepresentations about the bank's posting order. On the issue of remedy, which is the subject matter of this appeal, the Court held that the district court's restitution award was predicated on liability for Wells Fargo's choice of posting order, and was thus preempted. The Court therefore remanded for determination of what relief, if any, was appropriate for those affirmative statements standing alone. Now, on remand, the district court simply reinstated the original restitution award, even though that award was based on evidence that the plaintiff's claims themselves had conceded did not purport to quantify harm for misrepresentations. This remand decision was error as a matter of both Federal and State law. It was an error of State law because it fundamentally misapplied the established standard for measuring restitution under the UCL. And it was error as a matter of Federal law because the result was award, an award of relief for impacts that flowed exclusively from the bank's choice of posting order, conduct that is protected by Federal preemption. Now, the restitution calculation on which the district court relied measured the difference between the amount customers paid in overdraft fees in the real world and the amount they would have paid had the bank used a different posting order. As plaintiffs themselves admitted, their experts' model, upon which the district court relied, did not attempt to measure the restitution that would be due as a result of the impacts of things the bank said about the posting order. In other words, their experts' focus was exclusively on what would have happened if the posting order had been different. He did not attempt to figure out how customers would have fared differently, if at all, if the posting order was the same, and the only difference was that the challenge statements were never made. Now, under the UCL, restitution must be based on substantial evidence showing measurable amounts that were wrongfully taken by means of the specific conduct that is found to be unlawful. As the California Supreme Court has emphasized repeatedly, the primary remedy offered under the UCL is injunctive relief. Standing is relatively easy to establish under the UCL, and the ability to get injunctive relief is relatively easy. But restitution is only ancillary relief that is available where the plaintiff can make an additional showing, an evidentiary showing of a specific measurable amount that was wrongfully taken by means of the specific act that violated the statute. So here, the burden was on the plaintiffs to identify a measurable amount that was taken not as a result of the posting practice, but as a result of the bank's misstatements about the posting practice. The goal should be to put customers in the position they would have been in had the misstatements not been made, but the bank continued to post in high to low order. Instead, the methodology that was used simply assumed that the bank would have had to use a different posting order. That was exactly what this Court held to be impermissible in Gutierrez I. Or if the accurate statement had been made, perhaps the customer would have said, I'm not playing. I'm out of here. That is the proof that is absent here, Your Honor. Now, in a classic misrepresentation case, that's how restitution or the first step in how restitution is proven. You first prove that the customer would not have completed the transaction absent the misstatement. And then you have to have a measure of what is the value of what the customer received, and you calculate the difference between the two. This is an unusual case in which the evidentiary record and, in fact, the district court's findings below were flatly inconsistent with that. The district court's findings made two very critical findings that bear on this issue. First of all, the district court found that customers, including the named plaintiffs, overdrafted by mistake. This was not a situation in which customers relied on these statements, including the named plaintiffs, relied on these statements in order to overdraft their accounts or to conduct their transactions, and they got overdraft fees as a result that they wouldn't have anyway. There was no finding to that effect. To the contrary, the district court held that the overdrafts occurred by mistake. There was no finding that any customer ever overdrafted on purpose, ever incurred this service that the bank gave them on purpose. Would you then tie in that statement that you've made to the California Supreme Court's analysis in the Tobacco II case, where they talked about restitution and said that you don't need this individualized-type deception, which you seem to be arguing for when you're doing restitution because the trial court has a broad equitable power to frame restitution? I don't think that's quite what the California Supreme Court said in Tobacco II. What the California Supreme Court said in Tobacco II was that the named plaintiff had to show that the standard showing for fraud of actual reliance and resulting injury, and that for absent class members, there did not have to be, in order to have standing to proceed with the case as a class, you did not have to have an individualized showing that every individual person relied and suffered injury as a result. But what we're talking about here is the standard California rule, and this has been implied in multiple cases in the California courts, that to get restitution, you have to show a specific measurable amount with evidence that was obtained from the class members or the plaintiff, whoever it is, by reason of the unlawful conduct. So there has to be proof of a causal link. There may be multiple ways you can make that proof under California law, but you still have to prove a specific measurable amount that was obtained by reason of the wrongful conduct. So it's not wrong, as we know from the first case, to post Heidelo. That's not the wrongful conduct. But the wrongful conduct we're talking about here, just to make sure we're on the same page, is the statements about the posting, which will call for the misrepresentations or the claim to misrepresentations which the trial court found. So they found that there is a misrepresentation on posting, correct? There was a finding that there was a misrepresentation about posting. All right. And that, well, there was a finding, a misrepresentation about how that the debit card transactions were processed, from which an inference would be drawn that would be incorrect about posting. The district court, however, did not find that that was the sole source or even the main source of customers' belief about posting order. To the contrary, the district court's findings stated, and this is the other critical finding below, the district court stated repeatedly in its findings that this was the natural expectation, that this is what customers were going to believe, just logically, in the real world, which raises a question about, you know, what the impact of these statements was. What the district court found was that these statements reinforced that natural belief. That was the impact that the only impact that the district court found, was that it reinforced the natural belief that transaction posted in chronological order. That then the district court also found that overdrafts were incurred by mistake. So there was no evidence offered or finding the customers that absent these statements, customers would have behaved any differently, that they would have gone out and overdrafted less, much less, and this is what matters for today, much less that they would have overdrafted less in some specific amount. I mean, that's what the California courts have emphasized in the restitution cases. And again, even I would point you to the Kwikset case in the California Supreme Court, where the court emphasized that there is a big difference between the standard required to establish standing, which is just some harm, it can be very nebulous, very slight, versus what's required to establish restitution. And the rule has been unanimously followed in the California courts that there has to be a specific measurable amount of restitution that can be established. Now, I will say that in the prior appeal, this Court did state in footnote 9 of the opinion that there was a sufficient basis to conclude that the misstatements increased the magnitude of harm by which the name plaintiffs, by reason of, as a result of their mistake in overdrafting, that, yes, they made a mistake, but the magnitude of harm was increased. But this statement by this Court really just posed the question for the district court. It didn't answer the question, because the challenge, then, for the district court was to determine, is it possible to measure what that increase in the magnitude of harm was, and if it is possible, what is the number? The district court answered that first question in the negative. The district court said, no, it is not possible to separate out the impact of these misstatements and determine how what the impact of them standing alone was. Instead, the district court went a completely different direction in awarding restitution, and that is the part of the argument that the plaintiffs make to this Court, which is that there is somehow a permissible under the UCL to grant restitution based on an expectation measure of damages. Basically, what they say is that, no, we don't have to prove what the impact, what would have been different if the misrepresentations had never been made. It's all right. Instead, if we just show what would have been different if the misrepresentations had been true, so that, in fact, the bank had posted in a different order. And that's, of course, what the measure was. What would have been the difference if the bank had used a different posting order? But it's black-letter law that damages are not available under the UCL. Nor may a court award a disgorgement or any other general equitable or legal remedy, monetary remedy. The only monetary remedy that's available under the UCL is restitution. And that's limited to restoring to the plaintiffs, to the position they would have been in, but for the unlawful conduct. And if I can just draw an analogy, let's assume you have an art dealer who is selling, offering for sale, a painting that he says is, you know, at a bargain price, I'm going to sell you this genuine Picasso. And let's say I buy that genuine Picasso at that great price he offers me, and I take it home. And I discover that it's actually a very beautiful painting, but it's not actually by Picasso. And it's worth less as a result. Now, if I then bring a UCL claim and I establish liability, I would be entitled to restitution. But the measure of restitution I'd be entitled to would be the difference between what I paid for the painting and what the painting was actually worth. I would not be entitled to have the defendant give me a genuine Picasso or the market value of a genuine Picasso. That would be expectation damages of the kind you might get in a breach of contract case. But it is not restitution such as is permitted under the UCL. So what the district court basically did was award rest, basically as if this had been a breach of contract case, a measure, an inaccurate measure we contend, but a purported measure of expectation damages, and that's just simply not available under the UCL. Now, if I can just in 30 seconds spend just a moment on the injunction. The law is clear that an injunction has to be specifically tailored to the conduct that is found to be wrongful, and it must give fair notice of exactly what it is that the defendant is not allowed to do. Here, the injunction was extremely general. It basically was little more than go thou and sin no more. And that kind of injunction is not permitted, as this Court has held in multiple cases, including, I think most recently, the Del Webb case. An injunction has to say exactly what it is you're not allowed to do. It cannot just say you can't make false statements. It cannot just say you cannot violate the law. And that is basically what the district court's injunction here did. It is also improper for an injunction to go outside the claims in the case, outside the relief that is necessary to make the plaintiffs whole for the claims in the case, as this injunction did, because it not only this case was only about debit card transactions in a high-to-low posting environment, and the district court basically said, or explicitly said, that the injunction extends to checks and ACH transactions. Transactions should be never an issue. Sotomayor, let me ask you, if the injunction just said, don't make any misleading representations on the posting order of debit card purchases, what would be wrong with that? Because it doesn't say what the court deems to be a misrepresentation. And that's particularly important in this case. I mean, you're already not allowed to make misrepresentations. That's just an order to obey the law. Well, I guess you don't then there shouldn't be a problem of understanding what it says. I mean, we know, what do you want the court to say? To say details of, like, don't say high-to-low when it's not, say high-to-low, explain to the consumer in fine print, which they won't read, that, you know, this is the way we calculate. What do you want the order, the injunction to say? That the judge below found very specific statements to constitute misrepresentations. And, in fact, they were statements that weren't actually even about posting order of debit card transactions. But the district court found, and we accept for purposes of this appeal, that customers would make inference from them that those statements that would lead them to misunderstand posting order. So an appropriate injunction, appropriately terrible injunction, would say, do not say those things, which are found to be misleading. You're down to three minutes. You're down to three minutes. Thank you, Your Honor. Good afternoon, and may it please the Court. I'm Michael Sobel on behalf of Plaintiffs Veronica Gutierrez, Erin Walker, and the to have been deceived by virtue of Wells Fargo's affirmative misrepresentations regarding its debit card posting order. On remand, after this Court affirmed Wells Fargo's liability under the fraud prong of the unfair competition law and impliedly under the false advertising law, the district court enjoined Wells Fargo from making further misrepresentations and its sound and very broad discretion, which is afforded substantial deference, ordered restitution to return to the over one million Californians who are members of the class the amount of overdraft fees that may have been acquired directly from them by means of Wells Fargo's deception. That is not to say they were caused in the sense of a common law fraud claim, because that's not the standard under this substantive law. It's that which may have been acquired by the deception. And the deception of Wells Fargo has always been at the center of this case. The deception enabled Wells Fargo to reap enormous profits from its overdraft business. It impacted customers, causing an avalanche of unexpected fees. Had the obfuscation not taken place, the customers would have behaved differently. That's exactly what the trial court found. He found, absent the misrepresentations, the named plaintiffs would not have engaged in the injury-producing conduct that resulted in the unexpected fees. That finding was necessary to establish standing for the UCL, as invited by Prop 64. And so he found it, as a matter of fact, with respect to the named plaintiffs. The restitution, the harm caused by engaging in the injurious conduct, of course, was the unexpected overdraft fees. And the restitution measure does nothing more than return to the class these unexpectedly incurred overdraft fees. But what do you respond to Wells Fargo's statement that the district court also found that, in a way, they were accidental fees, in that they wouldn't have changed their conduct one way or the other based on the representations about the order of posting? Well, with respect to the named plaintiffs, we know that that's completely opposite to what the court found. The court found, as a matter of fact, that Veronica Gutierrez and Aaron Walker would not have engaged in the injurious conduct, but for the misrepresentations. And that's exactly the measure which Wells Fargo invites here, which I don't think is consistent with the principles of the UCL. But taking a look at it, they're saying, well, what if the representations hadn't been made, but we engaged in the same practice? And what the court found with respect to the named plaintiffs is, well, they just wouldn't have gotten hurt. They wouldn't have engaged in the transactions. They would not have engaged in the injurious conduct that gave rise to the harm, which is the unexpected fees. The fees they expected, of course, were those fostered by the affirmative misrepresentations by Wells Fargo into believing that they were going to be posting in a chronological order. So those fees that are unexpected, of course, are those that would have been incurred above and beyond that which would have been incurred through a chronological posting. So how do you get around the argument that what you're really getting here is expectation damages? That is to say, as I just heard you say, well, they behaved as if the promise of posting in the order in which the charges were made would be done. And we measure the recovery as if that had been done. That does sound like expectation damages. It's a restitution measure under the UCL because the UCL, and particularly in a deception claim, measures restitution as the difference between the value promised and the value received. That's time-honored UCL law. The Picasso art example doesn't work here. It's not that that would be expectation damages because if I bought a false Picasso, I might have expected it to be worth millions and millions. That millions and millions was never actually taken from me. But here it was. Here, the amount of unexpected overdraft fees were automatically deducted by the bank, came right out of people's personal accounts. That's a loss. That's harm. That's not an expectation measure of what I would have expected beyond what came out of me by virtue of the deception. The measure here was based on substantial evidence. And it is a measurable amount. It was calculated for the entire class on an account-by-account basis. That substantial evidence included both parties' efforts to calculate restitution for the fraud. Wells Fargo offered an alternative measure through its expert, asserting that some class members were on notice. Well, if you're on notice, you couldn't possibly have been deceived. And so in their proposed findings of fact, submitted after trial, they offered this dollar amount alternative measure based upon the fact that their assertion that some of the class members were not deceived. The court, of course, rejected that because he did not believe that the class nor the named plaintiffs were on notice. And all those instances and evidence which Wells Fargo sought to have admitted and was in fact admitted didn't prove that the class was on notice. It was further evidence of the obfuscation of the class and the further confusion. So instead, the judge chose a measure based upon the expectation fostered by the bank for believing that it would be posted in chronological order. And this is exactly what this Court affirmed the first time around on a class-wide basis, that Wells Fargo engaged in affirmative misrepresentations. And as a result, people and as a result, they were likely to have deceived the class. Now, the fact that the restitution measure now is in the same amount as it was the last time we were before Your Honors is not a surprise. The question came to me at one point during the last oral argument. I wish I had given a better response. I'll try it now. It's not surprising because the original measure was based on the deception. It was not based on the adoption of a posting order. In fact, at trial, we had proposed an alternative measure based upon the adoption of the high-to-low posting order. And we said you should compare it to what you were doing before you adopted high-to-low, which happened to be low-to-high. Now, that low-to-high comparison would have yielded a restitution amount far greater than the one at issue here. But the Court rejected it. He said he rejected a measure based upon the adoption of a posting order. And he instead chose one that he said was representative of a main theme of the plaintiffs at trial, and that is that the bank promoted an expectation of chronological posting through affirmative misrepresentations. The district court's choice in that regard was an exercise of restraint and moderation. What about the argument, and this folds into the expectation damages theory, that under the restitution value awarded, that the Court disregards actually that the consumers did get some value in having their overdrawn money. So it's not a net delta, in effect. Well, I think it is a net delta because the, the, the, what, what we measured at trial through copious evidence, and by the way, evidence drawn from not only all the class members' transactions during the class period, but every California customer during the class period to figure out who were victims of this. But the only variable that changes is the variable of the posting order. So in other words, maybe I could put it this way, Your Honor. The bank offers checking account services with various attributes, one of them being of a favorable attribute, represented attribute of chronological posting. But what they deliver is the same set of services with a much less favorable attribute, the attribute of high to low posting. And so when you measure the effect of the difference between the two, you're assuming all that value baked into the services anyway. The only changing variable is the change in posting order. And as this Court noted, and I think that was stated most emphatically by the District Court in its original findings, there's absolutely no consumer benefit to high to low posting. There's nothing, there's no advantage to that. Now, Wells Fargo tried to offer evidence and, and got admitted evidence. It's trying to say, well, we're doing that to help people. But, but the District Court didn't buy it. And I think at some point in the previous opinion, neither did this Court. So the only delta in the way that we did the measurement, which is to compare one posting against the other, only changed that one variable, which means that it assumed that they got all the other, all the other value associated with the checking account. Now, even though the Court originally based its restitution award on, on the basis of What we have now, because of the remand, is an additional and critical finding. And one that I think was missing from the opening statements of Wells Fargo. And that is that the Court specifically found the harm from Wells Fargo's affirmative misrepresentations came in the form of unexpected overdraft fees. This is the same harm as before. Now that that has been confirmed after remand, we can say that the restitution of this unexpected fee measure is fairly traceable to the fraud prong of the UCL, the violations of the fraud prong of the UCL and of the FAL. And therefore, must be said that which may have been acquired by means of the unfair competition. It was proven at trial and was affirmed on appeal. That's exactly how the UCL and the FAL should work. And how, in fact, were tiered. You know, as for the measurement that was actually made, the primary question, really, after the last appeal, after liability is affirmed, is was there really substantial evidence for the form of relief, the form of restitution and the injunction that the Court entered. And that means it doesn't, it's not arbitrary and capricious. But given the broad discretion afforded to the trial court in exercising its equitable jurisdiction to make a restitution award, if there are two or more reasonable inferences from the same set of facts and circumstances, we do not substitute his judgment. Which means, was there substantial evidence to do what he did? Is what he did justified by the substantial evidence? Not, does the substantial evidence suggest a better way to do it? Or a more appropriate way to do it? One that's more favorable to some other equitable interest that we can second guess on. And here, quite clearly, the choice of making a comparison to chronological ordering has to have been based on substantial evidence. It's what the whole trial was about, was building up this expectation through these fraudulent representations. So there was clearly substantial evidence for that. In fact, there must have been substantial evidence because that liability has already been affirmed. Then the question becomes, what about the actual comparison that he made? Was it, was it, was that based on substantial evidence? And of course it was. Because as I mentioned, we looked at every transaction for every day for over one million people once we, once we determined who's incurring multiple overdrafts on a single day. Then resequence this debit cards and compare the two and come up with this differential, what we call differentials at trial. And on a class-wide, looking at it on a class-wide basis, again, the whole trial was about Wells Fargo's efforts to claim that that would not be fair. That looking at it from this chronological point of view isn't fair because people are on notice. They had two experts for that point. One who measured it and one who said that people learn from their mistakes and we have to take that into account. They said that, you know, what about the account statements? What about the online banking? What about the overdraft notices? And in each instance, the trial court looked at all that and said, you know what? That's just more confusion. That's just more obfuscation. So the fact of the matter is, is that every time they attempted to put on evidence to combat the restitution measure or combat the methodology being used for the restitution, they had full and fair opportunity and the judge found what he found. Now, when it came to choosing among various chronological approximations, again, here this was a hotly contested issue at trial and the point here is that the bank didn't post a chronological, so how do you go about posting something in a chronological sequence to draw a comparison? And there we got into evidence about the bank's batch processing where they take a number of transactions at the end of the day and in the wee hours of the morning put them all together, sort them high to low. This case is about debit cards. We had to take the debit cards out of that batch process, reorganize them, reorder them in chronological order. We had to put them back in the batch. And the question is, where do you put them back in the batch? And this was, again, hotly contested. I mean, for instance, where do checks go? Do checks go before debit cards or after debit cards? And what the court finally determined is that the best place to put them is after the debit cards. Why? Because that's the chronological order. Because with a debit card, once you swipe it, the authorization goes through and from the bank's perspective, it's a must-pay item. Once that must-pay item appears in that night, it's one that must be paid. While checks appearing in that night, the decision hasn't been made to pay them yet. So from the authorization point of view, it was clearly more chronological to put checks second. And in fact, the senior most member of the bank's consumer banking department at trial said, you know what? If we were to do an alternative chronological posting, it would not be first. And in fact, there was even further evidence that when Wells Fargo test marketed chronological posting in another jurisdiction, what did they do? They put checks second. The point is that each and every step at trial in terms of how to calculate this restitution award was based not only on an exact measure for every individual, but based upon copious amounts of substantial evidence. On all opportunity, at all instances, Wells Fargo was offered and admitted evidence and was not precluded from admitting anything at all. With respect quickly to the injunctive relief, I apologize because I don't think our papers briefed the Dell web case, and they should have. I know one of your honors was on that panel. And I think it really actually speaks very persuasively to why the injunctive relief here is absolutely proper. And what he basically said is, don't lie about your posting order. And then he said, don't lie about your posting order, including some of these others. Well, first of all, it's not over-inclusive because it includes checks and ACH, because the bank batch processes. And so where you put things in relation to one another affects the order of debit cards. That was extensive at trial. And so he's reflecting his understanding of how it works and what's necessary to be said in order to give them clear guidance. So it's not over-inclusive. I could decide to do it differently. In other words, your expert had alternative means of when you put the checks in and when you don't. And this bank may do it one way, another bank may do it different. They could change their mind about how they do it, but not misrepresent. So I'm not sure why all those additional items need to be included. I guess what the judge was saying is, in order to not commit a misrepresentation about how you post debit cards, you have to put that in relation to everything else that you're posting. Because if you make a misstatement about how you post checks or ACH, it may very well affect the posting order of the debit cards, the effective posting order of the debit cards. Now, in the Dell Web case, what's interesting is that there were three specified items enjoined. And then there was this catch-all. Don't engage in illegal practices. And the court quite naturally said, well, illegal practices, that catch-all, that's just too vague. But engaging in a vague practice is a lot different than not lying about an identified practice. And then, by the way, when you look at the other enumerated specific prohibitions in the Dell Web case, they in fact are, don't commit representations about certain things. Just like what the judge did here. So the Dell Web case actually, I think, square on for us and demonstrates that the injunctive relief was quite proper here. One last point, briefly, and that is with regard to prejudgment interest. This is an item that the court hasn't had an opportunity to reach yet, and one that's been kicking around in litigation for a long time. And I just want to say that the passage of time makes this issue all the more important, because obviously the importance of prejudgment interest and interest on judgments is to provide some motivation for closure and to compensate litigants for the delay in time occurring through litigation. Prejudgment interest under 3287A of the California Civil Code is not discretionary if the monetary amount awarded is capable of being made certain by calculation. But at the time of the wrong. At the time of the wrong. Yes. That's your problem. And just asking more specifically, you have an expert who said, well, there's different ways you can look at this in terms of what would be the best way to put these people back. It depends on this alternative or that alternative. And then the judge says, well, I'm picking this. Right. So how can that be certain at the time of misrepresentation? Right, Your Honor. And two points, if I could just briefly address each one. I'll take the most recent one first. And that is, the question is whether or not, not whether or not an expert offers varying ways, various scenarios. Because there were a bunch here to pick from. And that's what the judge said. He said, if there's so many different things to pick from, then how can it be certain? The question is whether the one that was actually selected rendered the monetary amount capable of being certain by calculation. It can't be that prejudgment interest is just not available when an expert or litigants offer alternative measures. The question is whether the measure actually selected by the court was capable of being made certain at the time that it was committed, Your Honor. And here, what we have is we went back and we looked at all the transactions. We know the day and the amount of each unexpected overdraft fees pursuant to the methodology selected at the time that it was made. And so we can calculate from that day forward the amount of interest on each specified charge. Any further questions? Okay. Thank you. Verbal. Thank you, Your Honor. Mr. Sobel said early on in his argument that the district court found that the plaintiffs would have behaved differently in the absence of these misrepresentations and that, absent the conduct, they would never have engaged in the injury-producing conduct. As far as I am aware, there were no such findings. To the contrary, the district court did explicitly find that both of the named plaintiffs overdrafted by mistake. And I would refer you to page 32, paragraph 58 in the excerpts of record and page 38, paragraph 88 in the excerpts of record. There was no finding, and that's really part of the critical problem here. There was no finding that either these plaintiffs or anyone else would have behaved differently in the absence of these misstatements, much less any finding that there is a specific measurable amount by which they would have behaved differently. The plaintiffs state that there was harm because they got unexpected fees, but that doesn't answer the question of whether, regardless of whether these fees were unexpected or not. In fact, all of the fees that these plaintiffs got were unexpected. They didn't know they were overdrafting. It came as a surprise to them, and it was all unexpected. And they came as a surprise because they expected something different based upon the misrepresentation by your client. No, Your Honor. With respect, what they didn't know, they had overdrafted at all. They were not saying, oh, I'm overdrafting, but I expect that I'm only going to have to pay $30, and oh, now I'm surprised because I've been charged $60. They were surprised. It was unexpected that they were charged anything at all. And in fact, they were they did incur the service unknowingly. It was a valuable service. And that's, again, my complaint. Wait a minute. It was a valuable service because? It was a valuable service because these customers went out and used their debit cards to make purchases for which there was no money in their accounts. Right. And the bank covered that. But it was valuable in the sense in which I think you're wanting me to believe. It would have been valuable if Wells Fargo would have dishonored. But the practice of Wells Fargo was to honor and then do the overcharge fees. Well, Your Honor, the practice I think is an issue that was addressed by this court in the first appeal. And it's actually very complicated because the bank doesn't necessarily know at the time the card is used whether there's money in the account or not. Because there might be other transactions out there it doesn't know about yet. The customer is the only one that has full knowledge of what he's done in his account. But more importantly, what this court held in Gutierrez 1 is that the validity of the price that the bank charged for this overdraft service is something that is subject to federal preemption. It is not subject to attack under the UCL. So you cannot second-guess the value of the service and say, well, it's unfair. And that was really the case. Well, I don't want to get too deeply into the argument. Those are two very different propositions. We did hold, and I think we were right in so holding, that the order of posting is up to the bank. On the other hand, if the bank says one thing and does another, that's where we are. Absolutely, Your Honor. This panel drew a distinction. And that's what's important here is that the measure of harm from those two different kinds of conduct are difference. One is a measure of what's the difference between posting in the order the bank used versus posting in an order the district court found to be unfair. That's what this court held was not permissible. But the question for the misrepresentations is what is the amount the bank got from the customers solely because it made these misstatements? And again, misstatements to people who the district court found already would have believed that the bank was posting chronologically. Thank you, Counsel. That's something they would have already believed. Thank you, Your Honor. The case is here to be submitted for decision. We thank you both for your arguments.
judges: Thomas, McKeown, Fletcher